1    **WO**

2

3

4

5

6                  **IN THE UNITED STATES DISTRICT COURT**

7                     **FOR THE DISTRICT OF ARIZONA**

8

9    Chauncey Alexander, et al.,                No. CV-22-00781-PHX-DWL

10                    Plaintiffs,               **ORDER**

11   v.

12   Golden Margarita LLC, et al.,

13                    Defendants.
_____

14   Golden Margarita LLC, et al.,

15                    Counter Plaintiffs,

16   v.

17   Chauncey Alexander, et al.,

18                    Counter Defendants.

19

20
        This is an action under the Federal Labor Standards Act ("FLSA"), the Arizona

21
Minimum Wage Act ("AMWA"), and the Arizona Wage Act ("AWA") brought by

22
Chauncey Alexander ("Alexander") and Megan Krajewski ("Krajewski") (together,

23
"Named Plaintiffs"), two former employees of a now-defunct restaurant and bar known as

24
"The Golden Margarita." (Doc. 1.) Defendants are Golden Margarita LLC ("GM"), Ardor

25
Concepts LLC ("Ardor Concepts"), and Saraj Gem Ray ("Ray")[1], the entities and

26
individual who owned or otherwise played a role in the operation of The Golden Margarita

27
_____

28   [1]    Ray's spouse, Jane Doe Ray, is also named as a defendant.  Where applicable,
references to "Ray" include both Ray and Jane Doe Ray.

(collectively, "Defendants"). (*Id.*) The Court conditionally certified this matter as a collective action under the FLSA with respect to sub-collectives of Tipped Employees and Non-Tipped Employees (together, "Collective Members"). (Doc. 46.) In addition, GM and Ray have asserted a series of counterclaims against Named Plaintiffs. (Doc. 11.)

Now pending before the Court is Plaintiffs' motion for partial summary judgment on some of their wage claims against GM and Ray, as well as on all of GM's and Ray's counterclaims. (Doc. 75.) Separately, Ardor Concepts and Ray (together, "Moving Defendants") seek summary judgment on all of Plaintiffs' wage claims. (Doc. 76.) For the reasons that follow, each motion is granted in part and denied in part.

## BACKGROUND

I.    Factual Background

Unless otherwise indicated, the following facts are undisputed.

The Golden Margarita was a restaurant and bar located in Phoenix, Arizona. (Doc. 1 ¶ 12; Doc. 11 at 4 ¶ 12.) In September 2020, Ray acquired an ownership stake[2] in The Golden Margarita through GM. (Doc. 80-1 at 4 ¶ 28.) Ardor Concepts is a limited liability company licensed to transact business in Arizona. (Doc. 1 ¶ 65; Doc. 11 at 11 ¶ 65.)

In August 2020, The Golden Margarita hired Alexander. (Doc. 37-1 at 3 ¶ 2; Doc. 80-1 at 4 ¶ 29.) Alexander served as a payroll coordinator, which role included data entry and payroll processing. (Doc. 37-1 at 3 ¶ 4; Doc. 80-1 at 4 ¶ 30.) Alexander originally used payroll services provided by Automatic Data Processing, Inc. ("ADP") to complete The Golden Margarita's payroll. (Doc. 37-1 at 4 ¶ 15; Doc. 80-1 at 5 ¶¶ 37-39.) In or around November 2021, The Golden Margarita's relationship with ADP ended. (Doc. 80-1 at 5 ¶ 39.) Afterward, Alexander began manually calculating The Golden Margarita's payroll. (Doc. 37-1 at 4 ¶ 15; Doc. 80-1 at 6 ¶¶ 47-48.)

In or around November 2022, The Golden Margarita hired Jay Nazario ("Nazario") as a manager. (Doc. 80-1 at 4 ¶ 32.)

---

[2]    The parties dispute whether Ray acquired sole ownership (Doc. 75 at 3) or majority ownership (Doc. 76 at 5).

1      In or around January 2022, The Golden Margarita hired Krajewski.[3]  (Doc. 37-2 ¶ 2;

2   Doc. 80-1 at 6 ¶ 51.)

3      In May 2022, The Golden Margarita closed down.  (Doc. 80-1 at 6 ¶ 53.)

4   II.   Relevant Procedural History

5      On May 6, 2022, Named Plaintiffs initiated this action.  (Doc. 1.)

6      On June 17, 2022, Defendants filed an answer and GM and Ray filed various

7   counterclaims against Named Plaintiffs.  (Doc. 11.)

8      On March 15, 2023, the Court granted Named Plaintiffs' unopposed motion for

9   conditional certification.  (Doc. 46.)

10      On April 14, 2025, the parties filed their cross-motions for partial summary

11   judgment.  (Docs. 75, 76.)  Both motions are now fully briefed.  (Docs. 79, 80, 84, 85.)

12   Neither side requested oral argument.

13                              **DISCUSSION**

14   I.   Legal Standard

15      "The court shall grant summary judgment if [a] movant shows that there is no

16   genuine dispute as to any material fact and the movant is entitled to judgment as a matter

17   of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' only if it might affect the outcome of

18   the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue

19   in the non-movant's favor."  *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d

20   1119, 1125 (9th Cir. 2014) (citation omitted).  The Court "must view the evidence in the

21   light most favorable to the nonmoving party and draw all reasonable inference[s] in the

22   nonmoving party's favor."  *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018).

23   "Summary judgment is improper 'where divergent ultimate inferences may reasonably be

24   drawn from the undisputed facts.'"  *Fresno Motors*, 771 F.3d at 1125 (citation omitted).

25      A party moving for summary judgment "bears the initial responsibility of informing

26   the district court of the basis for its motion, and identifying those portions of 'the pleadings,

27

28   ───────────────
     [3]      The parties dispute whether Krajewski was hired and worked as a server (Doc. 37-2 ¶ 3) or as a lead server (Doc. 80-1 at 6 ¶¶ 51-52).

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103. "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id.* There is no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50. At the same time, the evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

"[W]hen parties submit cross-motions for summary judgment, [e]ach motion must be considered on its own merits," but the Court must consider all evidence submitted in support of both motions when separately reviewing the merits of each. *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (quotation marks omitted). For "the party with the burden of persuasion at trial" to succeed in obtaining summary judgment, it "must establish beyond controversy every essential element" of each claim on which summary judgment is sought. *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (quotation marks omitted). The party without

the burden of persuasion at trial is entitled to summary judgment where it establishes that the party with the burden of persuasion will be unable to prove at least one element of its claim in light of the undisputed facts. *Celotex Corp.*, 477 U.S. at 322-23. This distinction reflects that the burden is ultimately on the proponent of each claim to prove it. *Id.* ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

Where the Court "does not grant all the relief requested by the motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g). However, where "it is readily apparent that the court cannot grant all the relief requested by the motion, it may properly decide that the cost of determining whether some potential fact disputes may be eliminated by summary disposition is greater than the cost of resolving those disputes by other means, including trial. Even if the court believes that a fact is not genuinely in dispute it may refrain from ordering that the fact be treated as established." Fed. R. Civ. P. 56(g), advisory committee's note to 2010 amendment. *See also Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 415 (7th Cir. 2019) ("Because Rule 56(g) speaks of what a court 'may' do, we review for an abuse of discretion."); *NCWC Inc. v. CarGuard Admin. Inc.*, 2022 WL 17620550, *2 (D. Ariz. 2022) ("The decision whether to grant relief under Rule 56(g) is discretionary."); 2 Steven S. Gensler & Lumen N. Mulligan, Federal Rules of Civil Procedure, Rules and Commentary, Rule 56 (2025) ("[T]he decision whether to enter an order establishing facts is left to the trial court's discretion. No party has a procedural entitlement to have facts established by order.") (footnote omitted).

…

II.    <u>Plaintiffs' Claims</u>

The complaint asserts 14 claims against Defendants, with some only brought on behalf of certain Plaintiffs (depending on whether the Plaintiff was tipped or not tipped): (1) FLSA, failure to give tip credit notice; (2) AMWA, failure to give tip credit notice; (3) FLSA, improper tip retention; (4) AMWA, improper tip retention; (5) FLSA, improper paycheck deductions; (6) AMWA, improper paycheck deductions; (7) AMWA, excessive tip crediting; (8) FLSA, untimely and unpaid paychecks; (9) AMWA, untimely and unpaid paychecks; (10) FLSA, improperly calculating tip credit rates and using an 80-hour standard for overtime calculations; (11) FLSA, untimely and unpaid paychecks; (12) AMWA, untimely and unpaid paychecks; (13) AWA, untimely and unpaid paychecks; and (14) FLSA, using an 80-hour standard for overtime calculations.  (Doc. 1 ¶¶ 140-234.)

Plaintiffs affirmatively seek summary judgment on their some of their claims (Counts One, Two, Eight, Nine, Eleven, Twelve, and Thirteen) against some Defendants (GM and Ray).  (Doc. 75 at 2.)  Moving Defendants, in turn, seek summary judgment on all of "the claims asserted against them by Plaintiffs."  (Doc. 76 at 13.)

A.    **FLSA Claims: Counts One, Three, Five, Eight, Ten, Eleven, and Fourteen**

The FLSA requires employers covered by the statute to pay their employees a minimum hourly wage.  29 U.S.C. § 206.  The FLSA also permits employers to pay their tipped employees less than minimum wage under certain circumstances, upon sufficient notice.  *Id.* § 203(m)(2).  Referred to as a "tip credit," § 203(m)(2) allows employers to "pay tipped employees at an hourly wage below the minimum wage, provided that for the workweek the hourly wage and the employees' tips, taken together are at least equivalent to the federal minimum wage."  *Wagner v. Frimmel Mgmt., LLC*, 2016 WL 9527954, *3 (D. Ariz. 2016).

"To establish a minimum-wage or overtime violation of the FLSA, Plaintiff must establish three elements: (1) [Plaintiff] was an employee of Defendants, (2) [Plaintiff] was covered under the FLSA, and (3) Defendants failed to pay [Plaintiff] minimum wage or overtime wages."  *Smith v. Nov. Bar N. Grill LLC*, 441 F. Supp. 3d 830, 834 (D. Ariz.

2020) (citing 29 U.S.C. §§ 206(a), 207(a)).

1.   Employee/Employer

As for the first element, the term "employee," subject to a few narrow exceptions not relevant here, "means any individual employed by an employer," 29 U.S.C. § 203(e)(1), and the term "employer" "includes any person acting directly or indirectly in the interest of an employer in relation to an employee," *id.* § 203(d), such that where an individual, such as an owner, officer, or manager, "exercises control over the nature and structure of the employment relationship, or economic control over the relationship, that individual is an employer within the meaning of the Act, and is subject to liability." *Boucher v. Shaw*, 572 F.3d 1087, 1091 (9th Cir. 2009) (cleaned up). "[T]he definition of employer under the FLSA is not limited by the common law concept of employer, but is to be given an expansive interpretation in order to effectuate the FLSA's broad remedial purposes. The determination of whether an employer-employee relationship exists does not depend on isolated factors but rather upon the circumstances of the whole activity. The touchstone is the economic reality of the relationship." *Id.* at 1090-91 (cleaned up). *See also Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992) (noting that the "striking breadth" of the FLSA's definition of "employ" "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles"). "Generally, substantial ownership interest in a company is not sufficient on its own to be considered an employer under the FLSA. A defendant is an employer, however, where he has a significant ownership interest coupled with significant operational control." *McGarr v. Repossession Servs. of Ariz. LLC*, 2023 WL 6795082, *4 (D. Ariz. 2023) (citation omitted).

To determine whether an individual is an employer under the FLSA, courts in the Ninth Circuit apply an "economic reality" test and look to the "circumstances of the whole activity." *Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1469-70 (9th Cir. 1983). The economic reality test, which has been distilled into what are known as the *Bonnette* factors, considers "whether the alleged employer (1) had the power to hire and

fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Id.* at 1470.  *See also Lambert v. Ackerley*, 180 F.3d 997, 1012 (9th Cir. 1999) ("The district court instructed the jury that it could find the individual Ackerleys liable only if it determined that they had a significant ownership interest with operational control of significant aspects of the corporation's day-to-day functions; the power to hire and fire employees; the power to determine salaries; the responsibility to maintain employment records.  This instruction is entirely consistent with our interpretation of employer under the FLSA, and was in no way erroneous.") (cleaned up).  Although the *Bonnette* factors may prove useful in determining employment status under the FLSA, the economic reality test "is not a mechanical determination"—the *Bonnette* factors "are not etched in stone" and should "not be blindly applied." *Bonnette*, 704 F.2d at 1470.

Additionally, "[w]hen more than one entity is an employer for purposes of the FLSA, the entities are termed 'joint employers.'" *Torres-Lopez v. May*, 111 F.3d 633, 638 (9th Cir. 1997).  "All joint employers are individually responsible for compliance with the FLSA." *Bonnette*, 704 F.2d at 1469.  Because "a fundamental principle behind the joint employment doctrine" is "that a worker may be employed by more than one entity at the same time," "[t]he issue is not whether a []worker is *more* dependent upon" one entity or another. *Torres-Lopez*, 111 F.3d at 641.  "Rather, the inquiry must focus on the economic reality of the particular relationship between the []worker and the alleged joint employer." *Id.*

The Ninth Circuit has considered various factors when determining whether a joint employment relationship exists.  *See, e.g.*, *E.E.O.C. v. Pac. Mar. Ass'n*, 351 F.3d 1270, 1275 (9th Cir. 2003) ("In determining joint employment, various factors have been suggested in the collective experience of the judiciary and governmental agencies.  It is a rather elaborate collection and we choose to set forth these lists here with the caveat that they have been suggested for specific fact situations, certain of which are not present or relevant here.").  Factors considered in the Ninth Circuit include the four *Bonnette* factors

as well as the eight *Torres-Lopez* factors:

1.  whether the work was a specialty job on the production line;

2.  whether responsibility under the contracts between a labor contractor and an employer pass from one labor contractor to another without material changes;

3.  whether the premises and equipment of the employer are used for the work;

4.  whether the employees had a business organization that could or did shift as a unit from one worksite to another;

5.  whether the work was piecework and not work that required initiative, judgment or foresight [or a special skill];

6.  whether the employee had an opportunity for profit or loss depending upon the alleged employee's managerial skill;

7.  whether there was permanence in the working relationship; and

8.  whether the service rendered is an integral part of the alleged employer's business.

*Torres-Lopez*, 111 F.3d at 640 (cleaned up).

### a.    **The Parties' Arguments**

In Plaintiffs' motion for partial summary judgment, Plaintiffs argue that GM and Ray qualify as "employers" under the FLSA.  (Doc. 75 at 6.)  As for GM, Plaintiffs point to GM's admission, in response to a request for admission, "that [GM] was an employer under the FLSA."  (*Id.* at 6, citing Doc. 75-1 at 4.)  As for Ray, Plaintiffs, relying on the *Bonnette* factors, argue that the documentary evidence shows that Ray "did in fact possess, and exercise, such authorities."  (*Id.* at 6-7.)

In response, Defendants admit that GM "was an 'employer' under the FLSA." (Doc. 80 at 6 n.2.)  As for Ray, Defendants argue that the *Bonnette* factors demonstrate that he was not Plaintiffs' employer under the FLSA or, at the very least, that "there is a genuine issue of material fact."  (*Id.* at 6-10.)  Defendants cite a handful of cases and argue that a "corporate officer or managerial employee should not be considered an employer merely

- 9 -

by virtue of the fact that he or she is involved in employment decisions." (*Id.*)

In reply, Plaintiffs reiterate their arguments and cite various portions of the record to argue that "[w]hile [Ray] may have hired individuals to assist in the management of the restaurant, the evidence shows that he was the ultimate authority over employment decisions, including resolving issues of late or bounced paychecks." (Doc. 84 at 3-4.)

In Moving Defendants' motion for summary judgment, Moving Defendants argue that "the undisputed evidence in the record demonstrates that neither Ardor Concepts nor [Ray] was the 'employer' of Plaintiffs" under the FLSA. (Doc. 76 at 7.) Regarding Ardor Concepts, Moving Defendants argue that "Ardor Concepts was simply a holding company for a liquor license" and that it "did not employ a single individual, had no pay roll, and maintained no pay roll"—and, thus, "Plaintiffs can offer no evidence in support of its allegation that Ardor Concepts either was their 'employer' or that it 'jointly employed' them with [GM]." (*Id.* at 8-9.) Regarding Ray, Moving Defendants' arguments are essentially identical to those made in their response to Plaintiffs' motion. (*Id.* at 9-12.)

In response, Plaintiffs' arguments regarding Ray largely track those made in their motion for partial summary judgment. (Doc. 79 at 5-8.) As for Ardor Concepts, Plaintiffs appear to argue that a joint employment relationship existed between Ray and Ardor Concepts. (*Id.* at 8.)

In reply, Moving Defendants again focus on the *Bonnette* factors as to Ray, arguing that Plaintiffs have offered no evidence in support of those factors. (Doc. 85 at 5.) Moving Defendants add that "the fact that it is undisputed that [Ray] hired [Nazario] to run the day-to-day operations of [The] Golden Margarita . . . is both relevant and important to the Court's evaluation of the *Bonnette* factors." (*Id.* at 6.) As for Ardor Concepts, Moving Defendants reassert the arguments made in their motion.

b.    **Analysis**

GM. Both sides agree that GM was Plaintiffs' employer under the FLSA. Thus, Plaintiffs are entitled to partial summary judgment as to that issue.

Ardor Concepts. Ray avows in his declaration that Ardor Concepts only served as

a holding company for a liquor license, did not have any other assets, did not have any employees, did not maintain a payroll or payroll records, lacked hiring and firing authority, did not determine the terms and conditions of any Plaintiff's employment, and did not determine any Plaintiff's rate of payment or method of payment. (Doc. 80-1 at 3-4 ¶¶ 12-27.) Plaintiffs, in turn, do not specifically dispute any of these assertions but emphasize a photograph of a check in an effort to show that "[Ray] paid [Alexander] at least once through using Ardor Concepts." (Doc. 79 at 8, citing Doc. 79-4 at 2.)[4] Plaintiffs also highlight a text exchange between Ray and "Daelin Cavitt" (Doc. 76-1 at 17) in an effort to show that Ray has "written checks to [The] Golden Margarita employees from different business accounts." (Doc. 79 at 8.)

The parties have not addressed the *Torres-Lopez* factors in their briefs, focusing only on the *Bonnette* factors. Nevertheless, having considered both the *Torres-Lopez* and *Bonnette* factors, the Court concludes that Ardor Concepts does not qualify as an employer or joint employer under the FLSA. Plaintiffs have failed to provide any evidence to counter Ray's declaration that Ardor Concepts was merely a holding company for a liquor license and, more important, possessed none of the powers outlined in *Bonnette* or *Torres-Lopez*. *See*, *e.g.*, *Martin v. Lincor Eatery, Inc.*, 423 F. Supp. 3d 432, 444 (E.D. Mich. 2019) ("Sagano Properties and its co-Defendants are [not] 'joint employers' . . . . [T]his record fails to demonstrate that Sagano Properties—as an entity distinct from its manager, Mr. Teuber—possesses any . . . authority or control over its co-Defendants or the employees of the co-Defendant restaurants. As discussed earlier, the evidence shows that Sagano Properties is operated as a real estate holding company, with no employees, human resources functions, or personnel policies. Nothing in the record suggests that Sagano Properties shares with its co-Defendants any sort of control over the employees of the Defendant restaurants, nor that it—as opposed, again, to its manager, Mr. Teuber— participated in formulating the policies and practices that give rise to Plaintiffs' FLSA

---

[4]    Defendants dispute the admissibility of the photograph (Doc. 85 at 3), but for the reasons that follow, the admissibility of the check is irrelevant to the Court's analysis.

claims in this case."); *Mitchell v. Abercrombie & Fitch, Co.*, 428 F. Supp. 2d 725, 744-45 (S.D. Ohio 2006) ("Abercrombie & Fitch Co., is a holding company and not an operating company.  It has no employees, no payroll and operates no stores. . . .  Abercrombie & Fitch Co., is not an employer under the FLSA . . . .").[5]  There is no evidence that Ardor Concepts exercised even the slightest economic or operational control over The Golden Margarita's employees.  One ambiguous check to Alexander for an unstated reason at an unstated time does not show otherwise.  Because Ardor Concepts was not Plaintiffs' employer under the FLSA—a prerequisite for liability under the statutory scheme— summary judgment is granted in favor of Ardor Concepts on all of Plaintiffs' FLSA claims asserted against it.

    <u>Ray</u>.  The first *Bonnette* factor is the power to hire and fire employees.  The evaluation of this factor is complicated by ambiguities and unsupported statements in both sides' submissions.  For example, Ray's declaration somewhat conspicuously does not address whether he personally possessed hiring and firing authority or whether he personally hired or fired any Plaintiff—instead, Ray ambiguously attributes various hiring decisions to "The Golden Margarita." (Doc. 80-1 at 4-6 ¶¶ 29, 51.)  Ray does acknowledge, though, that he hired Nazario to serve as the general manager of The Golden Margarita. (*Id.* at 4 ¶ 32.)

    Meanwhile, although Plaintiffs cite Alexander's declaration in support of their assertion that "*Ray* hired [Alexander] to work at [The] Golden Margarita" (Doc. 79 at 3, emphasis added), Alexander's declaration does not support that assertion—Alexander merely declares that she "worked for Defendants" during certain time periods, without providing any information about who hired her. (Doc. 37-1 at 3 ¶¶ 2-3.)  Plaintiffs also, however, argue that Ray necessarily had the power to hire and fire under Arizona law by

---

[5]  The Court does not foreclose the possibility that, on a different record, a holding company might qualify as an employer or joint employer under Ninth Circuit law.  *Helm v. Alderwoods Group, Inc.*, 696 F. Supp. 2d 1057, 1067 (N.D. Cal. 2009) (rejecting SCI's argument that it "is merely a holding company and therefore it cannot be an 'employer' for wage and hour purposes" and stating that "whether SCI can be held liable for its subsidiaries depends on, *inter alia*, the type and degree of control it exercises over those entities, not on whether it is accurate to call SCI a holding company").

virtue of his status as a manager of The Golden Margarita.  (Doc. 75 at 7, citing A.R.S. §
29-3407(C)(2)).  Defendants' only response to that argument is that the analysis under the
economic reality test should be "structured" rather than "hypothetical."  (Doc. 80 at 8 n.3.)

       The bottom line is that, on this record, it is unclear who hired Plaintiffs and whether
Ray had the power to hire or fire them.  Accordingly, a genuine issue of material fact exists
with respect to the first *Bonnette* factor.

       The second *Bonnette* factor is whether the alleged employer supervised and
controlled employee work schedules or conditions of employment.  Plaintiffs argue that
Alexander "was subject to supervision and direction by [Ray]" (Doc. 75 at 4) and that Ray
exercised the authority to supervise and control employee work schedules (*id.* at 7).
Moving Defendants, on the other hand, argue that "Alexander herself acknowledged, she
reported directly to [Nazario] who was responsible for setting work schedules" (Doc. 76 at
12) and that Nazario was responsible for "overseeing employee work schedules and the
direct supervision of Alexander and Krajewski" (Doc. 80 at 3).

       The undisputed evidence favors Ray with respect to the second *Bonnette* factor.
There is no evidence that Ray had any involvement in setting Plaintiffs' work schedules or
otherwise controlling the day-to-day conditions of their employment.  At most, Plaintiffs
have presented evidence that Alexander considered Ray to be one of her supervisors
because he personally instructed her on how to perform a few discrete job functions related
to payroll calculations.  (Doc. 79-1 at 12 [Alexander's deposition testimony, identifying
Nazario and Ray as her supervisors]; Doc. 37-1 at 4-5 ¶¶ 15, 19 [Alexander's declaration:
"After Defendants no longer had ADP providing payroll processing services, I was
instructed by [Ray] as to the regular rates of pay for each employee. . . .  Ray would
sometimes even require me to reduce the hours worked of certain employees."].)  Even
though, as discussed below, this evidence may support Plaintiffs' position with respect to
the third *Bonnette* factor, it does not show that Ray had control over work schedules and
conditions of employment for purposes of the second *Bonnette* factor.  *Cf. Lambert*, 180
F.3d at 1012 (differentiating between "operational control of significant aspects of the

corporation's day-to-day functions" and "the power to determine salaries" as separate factors).

The third *Bonnette* factor is whether the alleged employer determined the rate and method of payment. Plaintiffs' declarations state that Ray was the individual with whom they would speak, or were told to speak, when they had issues regarding their paychecks. (Doc. 37-1 at 6 ¶¶ 26-28; Doc. 37-2 ¶ 21; Doc. 37-3 at 6 ¶ 25; Doc. 37-4 at 5 ¶¶ 22-24; Doc. 37-5 at 5 ¶¶ 18-21; Doc. 37-6 at 4-5 ¶¶ 16-19; Doc. 37-9 ¶¶ 9-12; Doc. 37-10 at 4 ¶¶ 11-12; Doc. 37-11 at 3-4 ¶¶ 8-12; Doc. 37-12 at 3-4 ¶¶ 9, 13-15; Doc. 37-13 at 5 ¶¶ 19-20.) Plaintiffs also provide text exchanges with Ray, or with Nazario involving statements made by Ray, in an effort to demonstrate that Ray determined the order of compensating employees, determined the rates of payment and hours worked, controlled paychecks, and was responsible for resolving paycheck issues. (Doc. 37-1 at 10-12, 16-22; Doc. 37-3 at 10-13; Doc. 37-4 at 8; Doc. 37-6 at 8; Doc. 37-7 at 9-10; Doc. 37-8 at 8-10; Doc. 37-10 at 17; Doc. 37-11 at 7-8; Doc. 37-12 at 8.)[6] Moving Defendants, on the other hand, argue there is no evidence that Ray had the authority to determine Plaintiffs' rate and method of payment. (Doc. 76 at 12.) Moving Defendants argue that "[t]he undisputed fact [Ray] attempted to resolve claims of alleged unpaid wages *after* certain former employees reached out to him following [*The*] *Golden Margarita's closure* . . . does not change this analysis." (Doc. 80 at 10.) Ray's declaration similarly states that "[w]ith regard to those employees who contacted me after [The] Golden Margarita's closing, it was the first time I was hearing about their concerns about the non-payment of wages by [The] Golden Margarita." (Doc. 76-1 ¶ 66.) Ray's declaration also discusses a series of text exchanges, attached to Doc. 76-1 as Exhibits A-H, in which he contends that several former employees reached out to him following the closure of The Golden Margarita about unpaid wages. (Doc. 76-1 ¶¶ 67-82.)

---

[6] Several of Plaintiffs' exhibits contain text exchanges with the same number—beginning in (480)—lacking a contact name. Plaintiffs' declarations make clear that that number belongs to Ray, and Ray does not dispute that fact. (*See, e.g.*, Doc. 37-7 at 5 ¶ 20 ["The set of text message screenshots, attached to this declaration as "Attachment 1," shows conversations between me and [Ray]."].)

If the evidence regarding the third *Bonnette* factor were limited to the Ray's efforts to sort out bounced or missing paychecks following the closure of The Golden Margarita, the analysis might present a closer call, but the evidence is not so limited. Plaintiffs have also presented evidence that Ray advised Alexander to change employee time clocks for anyone clocked in later than 3:00 AM (Doc. 37-1 at 19 [Ray: "Adjust that ASAP. The people that are clocked in till 4am. Change to 3am"]); that Ray engaged in text discussions with Alexander in which Alexander stated that she had re-run certain payroll figures "in regards to what *you requested* (25% off tips)" and Ray then questioned why this approach hadn't resulted in a larger decrease, *i.e.*, "[i]f it's 25% off the Tips. Why did it only go down $1000?" (Doc. 37-1 at 12, emphasis added); and that Ray engaged in discussions with Alexander and Nazario regarding the rate of payment for an employee (Doc. 37-1 at 17 [Ray: "Bella. Has anyone pay changed the past few months. I know I didn't approve any ?"]; Doc. 37-1 at 18 [Ray: "She said she was not aware of going down to $12. She said no one told her. I said we can have a discussion. Discussion has not happened & she still does the same things."]). Accordingly, the undisputed evidence establishes that Ray did, in fact, play a role in determining the rate and method of payment for employees at The Golden Margarita. Thus, the third *Bonnette* factor supports Plaintiffs' position that Ray is an employer under the FLSA.

The fourth *Bonnette* factor is whether Ray "maintained" employment records. Although Plaintiffs do not directly address this factor in their motion, their reply cites a text exchange between Ray and Sahra Ragab (Doc. 80-1 at 28) and argues that this exchange "flies in the face of [Ray's] claim that he had no access to payroll records or information." (Doc. 84 at 5.) Plaintiffs also note in their response to Moving Defendants' motion that, at least according to Alexander's deposition testimony, "Ray . . . had access to the ADP payroll system." (Doc. 79 at 3, citing Doc. 79-1 at 11.) Meanwhile, Defendants point to Ray's declaration, in which he avowed that "[The] Golden Margarita's payroll records were secured in the office located on the Company's premises with access to those payroll records restricted by code"; that "[f]rom the time Alexander started in the role of

1    Payroll Coordinator until Golden Margarita closed in May 2022, Alexander was the only
2    Golden Margarita employee with knowledge of the code and access to the payroll records
3    in the office"; and that he "did not have the code to access the payroll documents at any
4    point during the Relevant Time Period."  (Doc. 80-1 at 5 ¶¶ 34-36.)  Defendants also
5    highlight another portion of Alexander's deposition in which Alexander stated that no one
6    had access to ADP apart from herself.  (Doc. 80-2 at 11.)  Defendants thus argue that
7    "Plaintiffs[] attempt to conflate 'responsibility' with 'access.'"  (Doc. 85 at 5.)

8         There is no genuine dispute of fact with respect to the fourth *Bonnette* factor—it
9    favors Ray.  Even when resolving all factual disputes in Plaintiffs' favor, Plaintiffs'
10   evidence at most shows that Ray had *access* to The Golden Margarita's payroll records,
11   which were stored in the ADP payroll system.  But as other courts have explained, "[s]elf-
12   evidently, access to a company's books does not imply that one has the authority to
13   maintain employment records for that company.  Otherwise, every shareholder with the
14   right to access a company's books would also, by logical extension of this argument, have
15   the power to maintain employment records for that company, and become, in Plaintiff's
16   view, an employer of that company's employees.  That is an irrational position."  *Jianjun*
17   *Chen v. 2425 Broadway Chao Restaurant, LLC*, 2019 WL 1244291, *12 (S.D.N.Y. 2019).
18   *See also Frechette v. Zia Taqueria, LLC*, 2020 WL 607208, *8 (D.S.C. 2020) ("There is
19   no genuine dispute that the FOH managers did not maintain control over employment
20   records. . . .  Although Frechette has presented evidence that FOH managers have access
21   to sales records at the closing of a shift, the performance of clerical duties does not rise to
22   the level of maintaining employment records.  Therefore, this factor weighs against a
23   finding that the FOH managers are employers within the meaning of the FLSA.").

24        In sum, there is a genuine dispute of fact as to how the first *Bonnette* factor applies
25   to Ray but no genuine dispute as to the second and fourth *Bonnette* factors (which favor
26   Ray) or the third *Bonnette* factor (which favors Plaintiffs).  Accordingly, even though "the
27   ultimate question whether an individual is an employer for FLSA purposes is a question of
28   law to be determined by the court," *Collinge v. IntelliQuick Delivery, Inc.*, 2018 WL

1088811, *11 (D. Ariz. 2018), the Court cannot resolve that question in either side's favor in relation to Ray at summary judgment. *Cf. Narayan v. EGL, Inc.*, 616 F.3d 895, 901 (9th Cir. 2010) ("Judge Easterbrook has keenly observed in a case under the Fair Labor Standards Act that: [i]f we are to have multiple factors, we should also have a trial. A fact-bound approach calling for the balancing of incommensurables, an approach in which no ascertainable legal rule determines a unique outcome, is one in which the trier of fact plays the principal part. That there is a legal overlay to the factual question does not affect the role of the trier of fact.") (citation omitted).

As a result, the remainder of the analysis under the FLSA applies only to GM.

### 2.   Covered Under The FLSA

As for the second element, "coverage exists if either the employee is engaged in commerce (individual coverage), 29 U.S.C. § 203(b) (defining 'commerce' as 'trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof'), or the employer is an enterprise engaged in commerce (enterprise coverage, 29 U.S.C. § 203(s) (defining 'enterprise engaged in commerce' as enterprises that, *inter alia*, have annual gross revenue of $500,000 or greater)." *Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 914 (9th Cir. 2003). GM "admit[s] that enterprise coverage applies." (Doc. 80 at 6 n.2.) The Court therefore finds that Plaintiffs were employees covered under the FLSA in relation to GM.

### 3.   Failure to Pay Minimum Wage

In Counts Eight and Eleven, Plaintiffs allege that GM failed to pay (or, at a minimum, did not timely pay) tipped and non-tipped employees the minimum wages they were owed under the FLSA. (Doc. 1 ¶¶ 190-96, 210-16.)

The FLSA requires employers to pay employees certain minimum hourly wages. 29 U.S.C. § 206(a). "Although there is no provision in the FLSA that explicitly requires an employer to pay its employees in a timely fashion, [the Ninth] Circuit has read one into the Act. . . . [P]ayment must be made on payday, and . . . a late payment immediately becomes a violation equivalent to non-payment. After payday, the minimum wage is

1    unpaid. . . .   For purposes of the FLSA, there is no distinction between late payment

2    violations and minimum wage violations: late payment is a minimum wage violation."

3    *Rother v. Lupenko*, 515 F. App'x 672, 675 (9th Cir. 2013) (cleaned up).   *See also Biggs v.*

4    *Wilson*, 1 F.3d 1537 (9th Cir. 1993).

5                              a.    **The Parties' Arguments**

6            Plaintiffs argue that their documentary evidence shows that their "paychecks

7    regularly bounced or otherwise went unpaid due to Defendants' lack of funds."  (Doc. 75

8    at 8.)  Plaintiffs further argue that even if the payments were ultimately paid, "they still

9    constitute late payments" in violation of the FLSA.  (*Id.*)

10           In response, Defendants argue that "Plaintiffs rely on several conclusory statements

11   in a host of declarations by former employees of [The] Golden Margarita," none of which

12   "provide any evidence that these individuals were not actually paid their required wages

13   under the FLSA or identify the days, weeks or amounts that they were not paid."  (Doc. 80

14   at 10.)  Defendants argue that Ray's declaration (Doc. 80-1 at 2-9) and the text exchanges

15   between Ray and former employees (Doc. 80-1 at 11-37) "demonstrate[] the effort [GM]

16   made to pay several employees" and "[a]t a minimum, this evidence demonstrates that

17   there is a genuine issue of disputed fact as to whether [GM] paid its employees the wages

18   they were due."  (Doc. 80 at 11.)  As for Plaintiffs' arguments regarding late payments,

19   Defendants respond that Plaintiffs have failed to demonstrate "*when* and *which employees*

20   allegedly received late payments" and contend that *Biggs* is distinguishable because the

21   plaintiffs in that case "offered indisputable evidence that a specific payment was late by a

22   specific number of days."  (*Id.*)[7]

23           In reply, Plaintiffs argue that Defendants' response "ignores [Ray's] admission that,

24   by definition, his employees received late payments in violation of the FLSA."  (Doc. 84

25   ───────────────

26   [7]      Defendants also argue that "to the extent that Plaintiffs allege they are entitled to
     unpaid overtime under the FLSA, at the very least, Plaintiffs must satisfy their respective
     burdens under the U.S. Supreme Court's seminal decision in *Anderson v. Mt. Clemens*
27   *Pottery*, 328 U.S. 680 (1946)."  (Doc. 80 at 11.)  In reply, Plaintiffs clarify that they "[have]
     not sought summary judgment on any overtime claim asserted against Defendants."  (Doc.
28   84 at 6.)  As such, the Court need not address Defendants' arguments concerning overtime
     compensation.

                                        - 18 -

at 4.)  In support, Plaintiffs point to several of the text exchanges involving Ray (Doc. 80-1 at 11-13, 15, 20-21, 25-26, 28) and argue that "[t]he evidence . . . only serve[s] to prove that Defendants violated the FLSA due to late payments" (Doc. 84 at 5).  Plaintiffs also argue that "[s]etting aside that the dozens of text messages between Plaintiffs and [Ray] are dated, contain statements of the number of hours worked, and the fact that they were not paid, Defendants were required to keep and maintain such records and information, but failed to do so."  (*Id.*)  Moreover, Plaintiffs argue that "the alleged missing information is more relevant to the calculation of damages for Plaintiffs as opposed to the violation of the FLSA."  (*Id.*)  Plaintiffs further argue that Defendants failed to provide proof of negotiated checks, electronic payments, or text exchanges confirming that the employees were paid, such that "no evidence has been presented that [Ray] paid any individuals after the close of [The] Golden Margarita."  (*Id.* at 6.)

b.  **Analysis**

Plaintiffs' first theory of liability is that GM violated the minimum-wage provisions of the FLSA by wholly failing to pay them.  Plaintiffs are not entitled to summary judgment on this theory.  Although Plaintiffs proffer declarations and text exchanges suggesting that certain former employees' paychecks bounced or otherwise went unpaid (Docs. 37-1 through 37-13), Defendants counter that evidence by pointing to Ray's declaration (Doc. 80-1 at 7-9 ¶¶ 63-82) and text exchanges between Ray and certain former employees (Doc. 80-1 at 11-37) indicating that payments were made to individuals who reached out to Ray regarding unpaid wages.  Although Plaintiffs are correct that Defendants "fail[ed] to provide any evidence that such payments were made to individuals" in the form of "negotiated checks, . . . electronic payments, . . . [or] text confirmation from the employees that they received anything" (Doc. 84 at 6), the evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.

Plaintiffs' second theory of liability is that, at a minimum, GM violated the FLSA by making those wage payments in an untimely manner.  As noted, "[f]or purposes of the

FLSA, there is no distinction between late payment violations and minimum wage violations: late payment is a minimum wage violation." *Rother*, 515 F. App'x at 675. Although it seems likely that at least some Plaintiffs will prevail on this claim at trial, the imprecise and overbroad nature of Plaintiffs' evidentiary presentation precludes a ruling in their favor at this stage of the case. Again, this is a collective action under the FLSA involving two Named Plaintiffs and over 50 opt-in Plaintiffs. (Doc. 7 [Butts, Caldwell, Daley, Dame, Henry, King, Moreno, Rinsema]; Doc. 8 [Booth, Gooby, Harmelink, Henry, Herron, Meeks, Mitchell, Ozuna, Turmon-Wheeler]; Doc. 32 [Crittenden, Montoya, Torres, White]; Doc. 53 [Choi, Coughlin, Daniel, Freeman, Madrid Garcia, Ippolito, Keys, Lang, Pierce, Saldivar, Sorensen, Wenisch]; Doc. 54 [Morris, Parson, Purvis, Shank, Villasenor, Westbrook]; Doc. 55 [Buchanan, Cicero, Coriano, Detar, A. Gonzalez, C. Gonzalez, McKay, Ragab]; Doc. 57 [Acosta, Cavitt, Diaz, C. Gonzalez, Johnson, Quinn, Stuart]; Doc. 58 [Carranza]; Doc. 59 [McCuin]. *See also* Doc 65 at 2 [Plaintiffs' assertion in the Rule 26(f) report that "[c]urrently, 55 Opt-In Plaintiffs have filed consents to join this action"].) All of those Plaintiffs have joined in the summary judgment motion. (Doc. 75 at 2 ["Named Plaintiffs . . . along with the Collective Members . . . request that the Court enter summary judgment in their favor . . . ."].) And the motion requests a determination that GM violated each Plaintiff's rights under the FLSA. (*Id.* at 16 ["Plaintiffs respectfully requests [sic] that the Court find . . . that Defendants are therefore liable to Plaintiffs for violations of the FLSA and Arizona wage laws."].) The Court cannot make that determination on this record because there is no evidence regarding some Plaintiffs' work and wage history. For example, the record contains declarations from only 13 Plaintiffs. (Docs. 37-1 through 37-13.) The record also contains evidence that a handful of employees reached out to Ray, both before and after The Golden Margarita closed, with complaints about unpaid wages and bounced checks. (Doc. 80-1 at 7-9 ¶¶ 57-83.) Although this evidence suggests that at least a subset of Plaintiffs were paid late, it does not establish that each and every Plaintiff was paid late. Thus, the Court cannot issue a categorical ruling of FLSA liability, which is the only relief Plaintiffs have requested.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 4.    Tip Credit Notice

In Count One, Plaintiffs allege that Defendants failed to provide members of the Tipped Employee sub-collective with proper notice regarding the tip credit provision of the FLSA. (Doc. 1 ¶¶ 140-46.)

Under the FLSA, "an employer may fulfill part of its hourly minimum wage obligation to a tipped employee with the employee's tips. This practice is known as taking a tip credit. Section 203(m) of the FLSA obligates employers who take a tip credit to (1) give notice to its employees, and (2) allow its employees to retain all the tips they receive, unless such employees participate in a valid tip pool." *Oregon Rest. & Lodging Ass'n v. Perez*, 816 F.3d 1080, 1082 (9th Cir. 2016) (cleaned up). *See also* 29 U.S.C. § 203(m)(2)(A) ("The [tip credit provision] shall not apply with respect to any tipped employee unless such employee has been informed by the employer of the provisions of this subsection."). Accordingly, "[i]f an employer is not entitled to take the tip credit, but has done so anyway, it states a potential violation of FLSA's minimum wage requirement." *Wagner*, 2016 WL 9527954 at *9. *See also Mangahas v. Eight Oranges Inc.*, 754 F. Supp. 3d 468, 495 (S.D.N.Y. 2024) ("If an employer fails to provide the required notice . . . then the employer is disqualified from counting any tips as a tip credit and must pay the employee the minimum wage, without taking into account any tips that the employee may receive or have received."); *Nat'l Rest. Ass'n v. Solis*, 870 F. Supp. 2d 42, 45 (D.D.C. 2012) ("[I]f an employer fails to inform its tipped employees of the provisions of section 3(m), then no tip credit can be taken, and the employer is liable for the full minimum wage.").

### a.    **The Parties' Arguments**

Plaintiffs contend that "[m]ultiple tipped employees provided declarations that they did not receive notice of the tip credit." (Doc. 75 at 9.) Plaintiffs also contend that Defendants "failed to provide any evidence that they provided Plaintiffs with tip credit notice such that they were permitted to apply a tip credit against the wages of the Tipped Employees." (*Id.*)

Defendants do not respond to Plaintiffs' arguments and factual assertions regarding

the absence of tip credit notice.  The only mention of "tip credit" in the response is an allegation that Alexander was responsible for applying tip credits for employees.  (Doc. 80 at 4, 12; Doc. 80-1 at 4 ¶ 30, 6 ¶ 46.)

In reply, Plaintiffs argue that "Defendants fail to address [the tip credit notice] argument or the supporting facts in their response. As a result, the Court may grant summary judgment in Plaintiff's favor on this claim."  (Doc. 84 at 6, record citation omitted.)

### b.    **Analysis**

The analysis regarding Count One mirrors the analysis regarding Counts Eight and Eleven.  Although Plaintiffs have presented undisputed evidence that some Plaintiffs who fall within the Tipped Employee sub-collective did not receive notice of a tip credit but were nevertheless paid less than the full minimum wage on account of their receipt of tips (Doc. 37-2 ¶¶ 3-8; Doc. 37-3 at 3 ¶¶ 3-8; Doc. 37-4 at 3 ¶¶ 3-8; Doc. 37-5 at 3 ¶¶ 3-8; Doc. 37-6 at 3 ¶¶ 3-8; Doc. 37-7 at 3 ¶¶ 3-8; Doc. 37-8 at 3 ¶¶ 3-8), Plaintiffs have not presented evidence that every Plaintiff who falls within the Tipped Employee sub-collective lacked the required notice.  Thus, the Court cannot issue the across-the-board grant of summary judgment being requested.  Additionally, although Plaintiffs emphasize that Defendants failed to come forward with evidence that the required notice was provided, this amounts to improper burden shifting.  Because Plaintiffs are seeking summary judgment on a claim as to which they will bear the burden of proof at trial, they were required to affirmatively come forward with evidence sufficient to establish all of the elements of their claim.  *See*, *e.g.,* 2 Gensler, *supra*, Rule 56 ("Obviously, a party with the burden of proof cannot meet that burden merely by contesting the sufficiency of the other side's proof.  Rather, a party with the burden of proof must affirmatively put forth evidence that would satisfy its proof burden at trial.  If the moving party fails to identify and document facts that would support a finding for that party at trial, then the motion must fail."); *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir.1991) ("When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue

of material fact: it . . . must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party."). Because Plaintiffs failed to do so, Defendants were not required to do anything in response. *Finkle v. Ryan*, 174 F. Supp. 3d 1174, 1181 (D. Ariz. 2016) ("[U]nder the summary judgment standard, if the moving party fails to meet its initial burden of production, the opposing party need not produce anything.").

### B.    AMWA Claims: Counts Two, Nine, and Twelve

Plaintiffs move for summary judgment on a subset of their AMWA claims—Counts Two, Nine, and Twelve—against GM and Ray. [8]

"To state a claim under the AMWA, the defendant must be an employer under the statute, the plaintiff must be a qualified employee of the defendant, and the plaintiff must allege that she was not paid the applicable minimum wage for hours worked."  *Smith v. Helton Brewing Co.*, 2023 WL 5135142, *3 (D. Ariz. 2023) (internal quotation marks omitted).  The AMWA does not apply to a "small business," which is defined as "any corporation, proprietorship, partnership, joint venture, limited liability company, trust, or association that has less than five hundred thousand dollars in gross annual revenue and that is exempt from having to pay a minimum wage under [the FLSA]."  A.R.S. § 23-362(B)-(C).  *See also Helton Brewing Co.*, 2023 WL 5135142 at *3 ("In order to qualify as an employer, the corporation or limited liability company must generate no less than $500,000 in gross annual revenue.").

As both sides acknowledge, the AMWA "adopt[s] the FLSA's test for whether an

---

[8]    In their motion, Moving Defendants mistakenly state that Plaintiffs are only asserting claims against them "under two different statues: (1) the [FLSA]; and (2) Arizona Wage Payment Act."  (Doc. 76 at 2.)  As a result, Moving Defendants only seek summary judgment on Plaintiffs' FLSA and AWA claims and do not mention, let alone seek summary judgment on, Plaintiffs' AMWA claims.  (*Id.* at 7 ["For the reasons explained below, the undisputed evidence in the record demonstrates that neither Arbor Concepts nor [Ray] was the 'employer' of Plaintiffs for purposes of Plaintiffs' fourteen separate wage claims under the FLSA or AWPA."].)  However, in their reply, Moving Defendants argue for the first time that Ray is also entitled to summary judgment on Plaintiffs' AMWA claims.  (Doc. 85 at 2, 6.)  This argument is not properly before the Court.  *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").

employment relationship exists." *Tolano v. El Rio Bakery*, 2019 WL 6464748, *8 (D. Ariz. 2019). Accordingly, for the reasons stated in Part II.A.1-2 above, it follows that: (1) GM is an employer under the AMWA and its employees are covered under the AMWA; (2) Ardor Concepts is not an employer under the AMWA and is thus granted summary judgment on all of Plaintiffs' AMWA claims; and (3) a genuine issue of material fact exists as to Ray's status as an employer under the AMWA. As a result, the remainder of the analysis under the AMWA applies only to GM.

### 1.    Failure to Pay Minimum Wage

In Counts Nine and Twelve, Plaintiffs allege that GM failed to pay (or, at a minimum, did not timely pay) tipped and non-tipped employees the wages they were owed under the AMWA.

Like the FLSA, the AMWA requires employers to pay employees "no less than the minimum wage" as set out in the statute. A.R.S. § 23-363(A). An employer who fails to pay minimum wage is liable for "the balance of the wages . . . , including interest thereon, and an additional amount equal to twice the underpaid wages." *Id.* § 23-364(G). However, whereas the Ninth Circuit implies a timeliness requirement into the FLSA such that late wages are tantamount to unpaid wages, the AMWA is not construed in the same fashion. *Sao v. Pro-Tech Prods. Inc.*, 2019 WL 6909566, *4 (D. Ariz. 2019) ("[T]he Ninth Circuit implies a timeliness requirement into the FLSA . . . such that late wages are unpaid wages. Plaintiff has presented no equivalent obligation under the [AMWA], and the Court finds no cases mandating such. . . . Arizona also has a separate statute explicitly mandating timely payment of wages: the [AWA].").

At any rate, for the same reasons set forth in Part II.A.3 above, Plaintiffs are not entitled to summary judgment on Counts Nine and Twelve against GM.

### 2.    Tip Credit Notice

In Count Two, Plaintiffs allege that Defendants failed to provide members of the Tipped Employee sub-collective with proper notice regarding the tip credit provision of the AMWA. (Doc. 1 ¶¶ 147-54.)

The AMWA provides that "[f]or any employee who customarily and regularly receives tips or gratuities from patrons or others, the employer may pay a wage up to $3.00 per hour less than the minimum wage . . . ." A.R.S. § 23-363(C).  However, "an employer intending to exercise a tip credit shall provide written notice to the employee prior to exercising the tip credit.  Thereafter, the employer shall notify the employee in writing each pay period of the amount per hour that the employer takes as a tip credit." A.A.C. § R20-5-1207(C).  Thus, like the FLSA, the AMWA requires employers to provide tipped employees with a tip credit notice, but the AMWA also includes the added requirement that the notice be in writing.

As discussed in Part II.A.4 above, although Plaintiffs have provided declarations from some former tipped employees of The Golden Margarita asserting that they did not receive notice of the tip credit, they have not provided declarations from every Plaintiff who falls into that category.  Accordingly, Plaintiffs are not entitled to an across-the-board grant of summary judgment on Count Two, which is the only relief they have requested.

C.     **AWA Claim: Count Thirteen**

In Count Thirteen, Plaintiffs allege that Defendants failed to pay (or, at a minimum, did not timely pay) tipped employees the wages they were owed under the AWA.  (Doc. 1 ¶¶ 224-30.)

Although Plaintiffs mention Count Thirteen at the very outset of their motion, in an introductory paragraph listing all of the counts as to which they are seeking summary judgment (Doc. 75 at 2), Plaintiffs do not provide any reasoned argument in relation to Count Thirteen in the body of their motion.  The motion contains only two references to statutory provisions within the AWA and those references are unaccompanied by citations to supporting portions of the record.  (*Id.* at 8.)  In response, Defendants state: "Plaintiffs do not appear to seek summary judgment on their claims that Defendants violated the [AWA] (Count [Thirteen] of Plaintiffs' Complaint)." (Doc. 80 at 12 n.4.)  Plaintiffs' reply does not address this contention but contains another unexplained reference to Count Thirteen in a list of the counts that are the subject of Plaintiffs' motion.  (Doc. 84 at 3.)

1    Although Plaintiffs' briefing failures on this issue are alone a sufficient reason to

2    deny Plaintiffs' request for summary judgment on Count Thirteen, the request also fails on

3    the merits.  Plaintiffs' motion cites A.R.S. § 23-351(A) and of the AWA.  (Doc. 75 at 8.)

4    Those provisions require, respectively, that an employer "designate two or more days in

5    each month . . . as fixed paydays for payment of wages to the employees," *id.* § 23-351(A),

6    and that a discharged employee "shall be paid wages due him within seven working days

7    or the end of the next regular pay period, whichever is sooner," *id.* § 23-353(A).  Plaintiffs

8    do not identify evidence in the record establishing that Defendants failed to designate two

9    or more fixed paydays or failed to pay all discharged Plaintiffs within seven working days

10   of when each was discharged.

11       Moving Defendants also request summary judgment on Count Thirteen in favor of

12   Ray and Ardor Concepts, arguing that (1) "Ardor Concepts was not Plaintiffs' 'employer'

13   for purposes of . . . the . . . [AWA]"; and (2) "[a]s a matter of law, [Ray] is not an 'employer'

14   for purposes of the [AWA]" because "case law under the [AWA] makes clear that the

15   statute does not create a claim against an individual supervisor or manager."  (Doc. 76 at

16   8, 12.)  In response, Plaintiffs argue that they "are not asserting claims under [the AWA]

17   against Defendant Ray, only against [GM] and [Ardor Concepts]," and that "both entities

18   qualify as employers under [the AWA]."  (Doc. 79 at 9.)  In reply, Defendants argue that

19   "[t]o the extent Plaintiffs seek to recover damages from Ardor Concepts under the [AWA],

20   the record is also devoid of any evidence to establish Ardor Concepts is an 'employer.'"

21   (Doc. 85 at 4 n.1.)

22       The Court agrees with Moving Defendants that both Ray and Ardor Concepts are

23   entitled to summary judgment with respect to Count Thirteen.  As for Ray, although

24   Plaintiffs state that they did not intend to name him as a defendant in Count Thirteen, the

25   complaint suggests he is named as a defendant—Count Thirteen is broadly asserted against

26   "Defendants."  (Doc. 1 ¶¶ 224-30.)  At any rate, Ray correctly argues that he is not

27   considered an "employer" for AWA purposes because that statute defines the term

28   "employer" more narrowly than the FLSA or the AMWA.  *Rosen v. Fasttrak Foods LLC*,

2021 WL 2981590, *5 (D. Ariz. 2021) ("The term employer is defined much more narrowly under the AWA than it is under the FLSA or AMWA. . . .  [The] statutory definition does not . . . authorize individual liability against the owners, officers, and directors of a corporate employer in a case where the claim is for the employer's wholesale failure to pay wages.").  As for Ardor Concepts, as discussed in Part II.A.1 above, the record demonstrates that Ardor Concepts was nothing more than a holding company for The Golden Margarita's liquor license.  Thus, Ardor Concepts is not Plaintiffs' employer under the definition found in the AWA and Ardor Concepts is thus granted summary judgment on Count Thirteen.

III.    GM's and Ray's Counterclaims

GM and Ray have asserted various state-law counterclaims against Named Plaintiffs, all of which are premised on the notion that Named Plaintiffs were responsible for causing GM to engage in the conduct that now gives rise to Plaintiffs' wage claims.  Specifically, the counterclaims are: (1) breach of fiduciary duty; (2) fraud; (3) fraudulent concealment; (4) constructive fraud; (5) civil conspiracy; (6) aiding and abetting; (7) unjust enrichment; and (8) common law indemnity.  (Doc. 11 at 33-42 ¶¶ 37-101.)

Plaintiffs seek summary judgment on all eight counterclaims.  (Doc. 75 at 2.)

A.    **Count One: Breach of Fiduciary Duty/Duty of Loyalty**

Count One alleges that both Named Plaintiffs violated their "fiduciary duty/duty of loyalty" when they: (1) made unilateral changes to payroll records; (2) improperly voided or comped meals and "subsequently pocketed the cash paid by patrons"; (3) generally failed to account for tips paid to employees; and (4) concealed their payroll practices from Defendants for their own personal benefit.  (Doc. 11 at 34 ¶¶ 37-42.)

1.    The Parties Arguments

Named Plaintiffs argue that "Defendants can provide no evidence sufficient to show that any fiduciary duty existed between Named Plaintiffs and Defendants." (Doc. 75 at 11-12.)  As for Alexander, Named Plaintiffs argue that she "was a $16 per hour worker who provided what amounted to data entry services in the processing of Defendants' payroll,

first via ADP and then herself as directed by Defendants," and that she "was generally not present at Defendants' restaurant location to comp or void meals or account for tips received by employees." (*Id.*)  As for Krajewski, Named Plaintiffs argue that she was a "low-level" server who "did not have access to payroll records or practices," did not have the ability to comp/void meals, and was not responsible for accounting for tips paid to employees. (*Id.*)

In response, GM and Ray argue that Named Plaintiffs had "a heightened duty based on the responsibilities entrusted to them." (Doc. 80 at 12.)  As for Alexander, GM and Ray argue that "the evidence in the record demonstrates [The] Golden Margarita entrusted her with all the following critical responsibilities: processing employee timesheets; updating employee payroll records; responding to employee inquiries about payments; calculating employee overtime; establishing cash wages; applying tip credits for employees; and coordinating with payroll service providers on behalf of [The] Golden Margarita." (*Id.*) GM and Ray also argue that "Alexander acknowledged that she took on the responsibility to complete payroll by hand" and that "*Alexander was the only one who had access to* [*The*] *Golden Margarita's payroll record*." (*Id.*)  As for Krajewski, GM and Ray argue that she was the lead server and "had significant responsibilities relating to the disbursements of tips to [The] Golden Margarita servers." (*Id.* at 13.)  Thus, GM and Ray argue that "the undisputed evidence established that Alexander and Krajewski (and especially Alexander) had responsibilities consistent with the 'hallmarks' of the fiduciary duty." (*Id.*)

In reply, Named Plaintiffs argue that "despite [Defendants'] assertions that Named Plaintiffs duties were consistent with the 'hallmarks' of fiduciary duty, they fail to identify what the hallmarks are, or provide any support for why such duties are the hallmarks of fiduciary duty." (Doc. 84 at 7.)

## 2.    Analysis

In Arizona, the elements of a claim for breach of fiduciary duty are "the existence of a duty owed, a breach of that duty, and damages causally related to such breach." *Surowiec v. Cap. Title Agency, Inc.*, 790 F. Supp. 2d 997, 1004 (D. Ariz. 2011) (quoting

*Smethers v. Campion*, 108 P.3d 946, 949 (Ariz. Ct. App. 2005)).  The parties' summary judgment arguments focus on whether Named Plaintiffs owed GM and Ray a duty.

"In Arizona, while an employee/agent may owe his employer/principal a fiduciary duty," "Arizona courts have failed to impute, without referencing more specific or enumerated duties of loyalty, a fiduciary duty on rank-and-file employees based solely on common law agency principles." *Kiani v. Automatic Data Processing Inc.*, 2024 WL 3275119, *3 (D. Ariz. 2024) (cleaned up).  "Arizona courts have held that a fiduciary duty exists when there is a great intimacy, disclosure of secrets, entrusting of power, and superiority of position in the case of the representative, and that to establish a fiduciary (confidential) relationship there must be something approximating business agency, professional relationship, or family tie." *S.E.C. v. Rauscher Pierce Refsnes, Inc.*, 17 F. Supp. 2d 985, 992 (D. Ariz. 1998) (cleaned up).  "[W]hether a confidential relationship exists is a question of fact . . . provided there is sufficient evidence to submit the issue. When the evidence is insufficient to support a verdict, the trial court has a duty to decide the issue." *Rhoads v. Harvey Publ'ns, Inc.*, 700 P.2d 840, 846 (Ariz. Ct. App. 1984). *See also Caldwell v. J & J Rocket Co.*, 2014 WL 4954413, *7 (D. Ariz. 2014) ("While normally the issue of whether a fiduciary duty of loyalty has been breached is a question of fact to be determined by the trier of fact . . . evidence that is 'merely colorable' or 'not significantly probative,' as is the case here, is not sufficient to present a genuine issue of material fact for the trier of fact to resolve.").

In *Kiani*, the district court applied these principles in the course of determining whether an inside sales representative owed a fiduciary duty to his employer, ADP, such that ADP could sue him for committing "wage theft" by falsely reporting his hours on his timesheets.  2024 WL 3275119 at *1.  The court concluded that ADP's allegations were "insufficient to establish that Arizona recognizes a common law breach of fiduciary duty of loyalty claim by an employer against its employee for the employee's timekeeping practices" in part because ADP failed to allege "any of the hallmarks of a fiduciary association, including intimacy, secrets, or the entrusting of power *in addition* to the

existing employment relationship," reasoning that "ADP's trust and confidence in Kiani's timekeeping practices, alone, fails to create a fiduciary duty of loyalty punishable by law." *Id.* at *3.

For similar reasons, Named Plaintiffs are entitled to summary judgment on Count One. Turning first to Alexander, Named Plaintiffs point to Alexander's declaration, which describes her job duties at The Golden Margarita as including data entry and payroll processing. (Doc. 37-1 at 3 ¶ 4.) In response, GM and Ray merely proffer the portion of Alexander's deposition in which she described her role and access to the ADP system (Doc. 80-2 at 8-9), as well as inapplicable portions of the record in which she identified Nazario as her supervisor (Doc. 80-1 at 5 ¶ 33; Doc. 80-2 at 6). Thus, even with all reasonable inferences drawn in GM's and Ray's favor, the record fails to establish any "hallmarks" of a fiduciary association beyond Alexander's existing employment relationship at The Golden Margarita. As for Krajewski, Named Plaintiffs point to portions of the record demonstrating that she was simply a server at The Golden Margarita. (Doc. 37-2 ¶¶ 2-3; Doc. 11 at 32 ¶¶ 16-17.) In response, GM and Ray only cite the portion of Ray's declaration claiming that Krajewski was a lead server who oversaw the disbursement of tips. (Doc. 80-1 at 6 ¶ 52.) No reasonable jury could find that Krajewski, even if she was a lead server who oversaw the disbursement of tips, was anything but a quintessential rank-and-file employee—and, thus, did not owe any fiduciary duty to GM and Ray.

## B.    Count Two: Fraud

Count Two alleges that Alexander committed fraud by falsely representing that she "was activating services with a new payroll service provider"; that "[a]t the time the representations were made, Ray was not aware a new payroll service provider was not activated, or in the process of being activated, or that Alexander was handling payroll on her own"; and that Ray relied on the misrepresentations to his detriment because they led him to "continu[e] to pay GM's employees in accordance with Alexander's payroll practices." (Doc. 11 at 35 ¶¶ 45, 51, 53.)

…

1          1.     The Parties Arguments

2          Named Plaintiffs argue that Count Two fails because Ray "was aware of the status

3   and process of payroll following the cancellation with ADP." (Doc. 75 at 13.) Specifically,

4   Named Plaintiffs argue that, following the termination of ADP's payroll service,

5   "Alexander, with the knowledge and instruction of [Ray], attempted to engage Toast as a

6   new payroll provider." (*Id.*) In support, Named Plaintiffs cite a series of email exchanges

7   in which "[t]he representative from Toast requested specific information from [Ray]" and

8   in which "Alexander, along with the Toast Representative diligently followed up with

9   [Ray], advising him they still needed the requested information." (*Id.*) Named Plaintiffs

10  further argue that Ray was aware "that no subsequent payroll services was activated" and

11  that "Alexander was calculating payroll herself . . . at his instruction." (*Id.*)

12         In response, GM and Ray acknowledge that Ray was copied on one of the proffered

13  emails but argue that this "evidence does not demonstrate that [Ray] knew Alexander failed

14  to ultimately retain a third-party service provider or that Alexander was completing payroll

15  by hand." (Doc. 80 at 13.) In support, GM and Ray point to Ray's assertion in his

16  declaration "that he did not learn that Alexander was handling [The] Golden Margarita's

17  payroll services on her own without assistance from a payroll service provider until after

18  [The] Golden Margarita closed its doors in May 2022." (*Id.*) GM and Ray thus argue that

19  a genuine issue of material fact exists as to whether they "were aware of Alexander's failure

20  to retain a third-party payroll provider." (*Id.*)

21         In reply, Named Plaintiffs argue that "Defendants continue to rely on demonstrably

22  false statements from [Ray] as their sole source of evidence to support their claims." (Doc.

23  84 at 8.) Specifically, Named Plaintiffs argue that "the record shows that ADP cancelled

24  services due to Defendants' lack of payment" and that, despite Alexander's attempts to set

25  up payroll services through Toast, "Ray failed to provide necessary information." (*Id.*)

26  Named Plaintiffs further argue that Ray "was not simply copied on one email" but was

27  "part of multiple email threads, with many of the emails directed towards him." (*Id.*)

28  Named Plaintiffs also point to a text exchange between Alexander and Ray, which

1    purportedly demonstrates that "Ray was aware that no provider was engaged, and that

2    [Alexander] was completing payroll on her own because . . . she even confirmed with him

3    via text message." (*Id.*) Named Plaintiffs also argue that "it would be an impossibility for

4    [Ray] not to have discovered that no third-party payroll provider was engaged until after

5    the restaurant closed" because Alexander quit several weeks before The Golden Margarita

6    shut down. (*Id.*)

7            2.    Analysis

8            "[T]o maintain an action for fraud under Arizona law, a plaintiff must sufficiently

9    plead: (1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge

10   of its falsity or ignorance of its truth, (5) the speaker's intent that it be acted upon by the

11   recipient in the manner reasonably calculated, (6) the hearer's ignorance of its falsity, (7)

12   the hearer's reliance on its truth, (8) the right to rely on it, and (9) a consequent and

13   proximate injury." *Arnold & Assocs., Inc. v. Misys Healthcare Sys.,* 275 F. Supp. 2d 1013,

14   1027 (D. Ariz. 2003) (citing *Nielson v. Flashberg,* 419 P.2d 514, 517-18 (Ariz. 1966)).

15   The only element challenged in Named Plaintiffs' motion is the sixth element—whether

16   Ray was aware of the falsity of Alexander's alleged misrepresentation that she had retained

17   a new payroll service provider to replace ADP.[9]

18           On the one hand, Ray's assertion in his declaration that he did not become aware

19   "until after [The] Golden Margarita closed its doors in May 2022" that Alexander had

20   failed to retain a new payroll provider to replace ADP and was personally handling The

21   Golden Margaria's payroll (Doc. 80-1 at 6 ¶¶ 47-48) is blatantly contradicted by the

22   documentary evidence in the record. On February 10, 2022, Ray sent an email to an

23   unidentified group of individuals. (Doc. 75-2 at 7.) In this email, Ray stated "R + Mark

24   . . . Can you please send this info," and provided various categories of information identical

25   _____

26   [9]        Ray avows in his declaration that Alexander made such a representation to him in
     or around November 2021. (Doc. 80-1 at 5 ¶¶ 39, 42 ["Because of repeated problems with
27   ADP, I allowed Alexander to end Golden Margarita's services with ADP in around
     November 2021. . . .  Within days, Alexander reported to me that she had secured a new
28   payroll provider and that Golden Margarita's payroll services were being activated with
     the new provider."].)    Alexander does not specifically deny this accusation in her
     declaration. (Doc. 37-1.)

to those subsequently requested by Alexander for payroll to be rolled over to a new platform. (*Id.*) On March 10, 2022, Alexander—replying to the February 10 email sent by Ray—sent an email to Ray, Nazario, and others entitled "Toast Payroll Integration." (*Id.*) In this email, Alexander stated that she "urgently" needed various categories of information "so that payroll can be rolled over to the new platform." (*Id.*) About two weeks later, on March 22, 2022, Alexander sent a follow-up email to Ray, Nazario, and others entitled "BEYOND URGENT! INFORMATION NEEDED ASAP!!!" (*Id.* at 3.) In this email, Alexander stated that she was still "needing [certain] information so that payroll can be rolled over to the new platform," reminded the recipients that she had previously "sent multiple requests out for this information that is needed for payroll to be rolled out successfully," and emphasized that "[o]nce again, we are in dire need of this information so that we can have the proper system start for pay roll." (*Id.*) Additionally, on April 20, 2022, Alexander sent a text message to Ray and Nazario that included a detailed breakdown of two different options for calculating employees' paychecks for an upcoming pay cycle, explaining that the first was "the way I've been doing payroll" and the second was "in regards to what you requested (25% off tips)." (Doc. 37-1 at 10-12.)

On the other hand, although this documentary evidence establishes that Ray was aware, beginning in February 2022, that Alexander had not retained a new payroll service to replace ADP, the fraud counterclaim is not dependent on Ray remaining unaware of this fact until May 2022. Ray avows that Alexander falsely told him in or around November 2021 that she had retained a new payroll provider (Doc. 80-1 at 5 ¶¶ 37-42) and that he subsequently relied on this false statement to his detriment (*id.* at 6 ¶¶ 45-48). Accordingly, even when Named Plaintiffs' documentary evidence is factored into the equation, there is still a time period (November 2021 to February 2022) in which the other evidence in the record, construed in the light most favorable to GM and Ray, suggests that Ray was unaware of the falsity of Alexander's alleged false statement. Thus, Alexander is not entitled to summary judgment on Count Two.

…

C.    **Count Three: Fraudulent Concealment**

Count Three alleges that both Named Plaintiffs committed the tort of fraudulent concealment by actively and purposefully concealing that they (1) made unilateral changes to payroll records; (2) improperly voided or comped meals and took the extra compensation; (3) generally failed to account for tips paid to employees; (4) concealed their payroll practices from Defendants for their own personal benefit; and (5) handled payroll practices without assistance from a third-party.  (Doc. 11 at 36-47 ¶¶ 55-62.)

1.    The Parties Arguments

Named Plaintiffs argue that Count Three fails because (1) "Ray was included on communications regarding payroll providers, as well as payroll itself and amounts paid to employees"; and (2) "Defendants have produced no evidence to support their claims that Named Plaintiffs engaged in any of the above described, or any other, wrongful acts." (Doc. 75 at 14.)

In response, GM and Ray incorporate their previous arguments regarding Counts One and Two.  (Doc. 80 at 13.)  GM and Ray add that Alexander engaged in wrongful conduct when she failed "to provide [The] Golden Margarita with any of the payroll documents she created."  (*Id.* at 13-14.)

In reply, Named Plaintiffs argue: "Defendants have failed to provide any evidence that Named Plaintiffs engaged in any wrongful acts. The objective evidence shows that [Ray] was aware that no third-party payroll provider was in place and that he was aware that [Alexander] was manually calculating payroll."  (Doc. 84 at 9.)

2.    Analysis

"Arizona recognizes the tort of fraudulent concealment: 'One party to a transaction who by concealment or other action intentionally prevents the other from acquiring material information is subject to the same liability to the other, for pecuniary loss as though he had stated the nonexistence of the matter that the other was thus prevented from discovering.'"  *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Loc. No. 395 Pension Tr. Fund*, 38 P.3d 12, 34 (Ariz. 2002) (quoting Restatement (Second) of Torts

§ 550 (1976)).  Additionally, "in a fraudulent concealment action, 'a party may be liable for acts taken to conceal . . . , even in the absence of a fiduciary, statutory, or other duty to disclose.'"  *Rindlisbacher v. Steinway & Sons Inc.*, 497 F. Supp. 3d 479, 495 (D. Ariz. 2020) (quoting *Wells Fargo Bank*, 38 P.3d at 21).

Alexander is not entitled to summary judgment on Count Three for the same reasons she is not entitled to summary judgment on Count Two—there is just enough evidence to support a fraudulent concealment claim against her arising from her payroll-related conduct.

In contrast, Krajewski is entitled to summary judgment on Count Three.  In response to Named Plaintiffs' summary judgment motion, which challenged the sufficiency of GM's and Ray's evidence, GM and Ray failed to come forward with any cognizable evidence that Krajewski had any involvement in changing the payroll, comping and voiding meals, or failing to account for tips.  *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out that there is an absence of evidence to support the nonmoving party's case.") (cleaned up); 2 Gensler, *supra*, Rule 56 ("[A]ll courts agree—and this was the critical point of *Celotex*—that the moving party's only burden is to address the existing proof record and in some measure identify some hole in that proof.  The moving party need go no further, and in particular is not obligated to submit new proof showing that there is nothing missing that could fill that hole.").  Indeed, the only fleeting references to those topics appear in paragraphs 53 and 54 of Ray's declaration, which state that "[a]fter [The] Golden Margarita closed in May 2022, I discovered Krajewski also comped and voided meals without authorization and, upon information and belief, subsequently pocketed the cash paid by patrons for those meals" and "[a]fter [The] Golden Margarita closed in May 2022, I discovered that Krajewski also failed to declare tips and encouraged other Golden Margarita employees to do the same."  (Doc. 80-1 at 6 ¶¶ 53-54.)  These conclusory assertions, bereft of dates or details (and in some instances, not even assertedly based on Ray's own personal knowledge), are insufficient to avoid summary judgment.  *See, e.g.,*

1   *Safety PPE, LLC v. Skanda Grp. of Indus. LLC*, 2024 WL 2816494, *1 (9th Cir. 2024)

2   ("Skanda Group's and Karri's opposing evidence—a single affidavit in which Karri insists

3   each transaction was legitimate—is insufficient to create a triable issue.   Summary

4   judgment may not be resisted with an affidavit stating only conclusions, or lacking detailed

5   facts or supporting evidence."); *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th

6   Cir. 2015) ("The district court can disregard a self-serving declaration that states only

7   conclusions and not facts that would be admissible evidence."); *FTC v. Publ'g Clearing

8   House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit,

9   lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue

10  of material fact."); *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993) ("When the

11  nonmoving party relies only on its own affidavits to oppose summary judgment, it cannot

12  rely on conclusory allegations unsupported by factual data to create an issue of material

13  fact.").

14      D.    **Count Four: Constructive Fraud**

15      Court Four is a claim against both Named Plaintiffs for constructive fraud.  (Doc.

16  11 at 37-38 ¶¶ 63-72.)  Named Plaintiffs argue they are entitled to summary judgment on

17  this claim because, among other things, it must be premised on a fiduciary duty, which is

18  lacking here.  (Doc. 75 at 14.)  In their response, GM and Ray make no effort to address

19  this argument or otherwise defend the sufficiency of Count Four.  (Doc. 80.)

20      Named Plaintiffs are correct about the law.  *Dawson v. Withycombe*, 163 P.3d 1034,

21  1057 (Ariz. Ct. App. 2007) ("Constructive fraud is a breach of legal or equitable duty

22  which, without regard to moral guilt or intent of the person charged, the law declares

23  fraudulent because the breach tends to deceive others, violates public or private

24  confidences, or injures public interests.  While it does not require a showing of intent to

25  deceive or dishonesty of purpose, it does require a fiduciary or confidential relationship.")

26  (citations omitted).  And as discussed in Part III.A above, no reasonable juror could find,

27  on this record, that Named Plaintiffs owed fiduciary duties to GM and Ray.  Accordingly,

28  Named Plaintiffs are entitled to summary judgment on Count Four.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

E.     **Count Five: Civil Conspiracy**

Counts Five is a claim against both Named Plaintiffs for civil conspiracy.  (Doc. 11 at 38-39 ¶¶ 73-77.)  It alleges that Alexander and Krajewski "conspired and agreed to accomplish multiple tortious acts, including, without limit, breaches their fiduciary duties / duties of loyalty, fraudulent concealment, and constructive fraud."  (*Id.* at 39 ¶ 74.)

Among other things, Named Plaintiffs argue that Count Five fails because a "civil conspiracy claim requires Defendants to prove that Named Plaintiffs entered into an agreement by clear and convincing evidence" and "Defendants have no evidence of an agreement between the Named Plaintiffs."  (Doc. 75 at 14.)  In their response, GM and Ray make no effort to address this argument or otherwise defend the sufficiency of Count Five.  (Doc. 80.)

Named Plaintiffs are correct about the law.  *Wells Fargo Bank*, 38 P.3d at 499 ("[A] claim for civil conspiracy must include an actual agreement, proven by clear and convincing evidence . . . .").  Accordingly, under *Celotex*, GM and Ray were obligated to come forward with evidence of an agreement between Alexander and Krajewski to commit one or more of the alleged torts.  They failed to do so—Ray's declaration, for example, says nothing about an agreement between Alexander and Krajewski.  It follows that Named Plaintiffs are entitled to summary judgment on Count Five.

F.     **Count Six: Aiding And Abetting**

Count Six is a claim against both Named Plaintiffs for aiding and abetting.  (Doc. 11 at 39-40 ¶¶ 78-82.)  It alleges that Alexander and Krajewski "substantially assisted one another, and/or encouraged one another, to achieve the unlawful acts and/or breaches of duties."  (*Id.* at 40 ¶ 81.)

Named Plaintiffs argue that Count Six fails for two reasons: (1) "Defendants cannot provide any evidence to support their claims that the Named Plaintiffs engaged in any of the alleged improper conduct"; and (2) "[t]he aiding and abetting claim requires that the primary tortfeasor's conduct constitute a breach of duty," but "Defendants have no evidence to show that Named Plaintiffs owed Defendants a fiduciary duty."  (Doc. 75 at

14.)  In their response, GM and Ray make no effort to address these arguments or otherwise defend the sufficiency of Count Six.  (Doc. 80.)

Count Six fails for essentially the same reasons as Count Five.  In Arizona, "any claim of aiding and abetting the fraud of another requires proof of three elements: (1) commission of fraud by the primary tortfeasor that results in harm to the plaintiff; (2) defendant's knowledge of the fraud; and (3) the defendant's substantial assistance or encouragement of the primary tortfeasor."  *Lemmen Meyer v. Mandig*, 2019 WL 6336541, *2 (Ariz. Ct. App. 2019).  *See also Wells Fargo Bank*, 38 P.3d at 23 ("Claims of aiding and abetting tortious conduct require proof of three elements: (1) the primary tortfeasor must commit a tort that causes injury to the plaintiff; (2) the defendant must know that the primary tortfeasor's conduct constitutes a breach of duty; and (3) the defendant must substantially assist or encourage the primary tortfeasor in the achievement of the breach.").  Named Plaintiffs' first summary judgment argument is essentially a *Celotex* argument and thus required GM and Ray to come forward with evidence that would be sufficient to establish all of the elements of an aiding-and-abetting claim.  GM and Ray failed to do so.  For example, because GM and Ray have failed to come forward with cognizable evidence that Krajewski committed *any* tort, there is no tort by a "primary tortfeasor" that Alexander could have aided and abetted.  And although GM's and Ray's evidence is sufficient to show that Alexander may have committed the torts of fraud and fraudulent concealment as alleged in Counts Two and Three, there is no evidence that Krajewski had knowledge of Alexander's alleged fraud or substantially assisted or encouraged it.  Accordingly, Named Plaintiffs are entitled to summary judgment on Count Six.[10]

### G.    **Count Seven: Unjust Enrichment**

Count Seven is a claim against both Named Plaintiffs for unjust enrichment.  (Doc. 11 at 40-41 ¶¶ 83-90.)  It is asserted "in the alternative to provide Counterplaintiffs an

---

[10]    With the said, Named Plaintiffs' second argument in relation to Count Six—that an aiding-and-abetting claim must be premised on the breach of a fiduciary duty—is incorrect.  As *Lemmen Meyer* and *Wells Fargo Bank* recognize, an aiding-and-abetting claim may be premised on the primary tortfeasor's commission of a tort that does not involve a breach of fiduciary duties, such as a standard fraud claim.

avenue for recovery if the Court determines Counterplaintiffs have no other adequate or sufficient remedy at law" and is premised on the allegation that Named Plaintiffs "have been enriched by the improper and unlawful conduct alleged elsewhere herein. For example, and without limitation, [Named Plaintiffs] have profited from their scheme when they, among other things, unilaterally changed payroll records, comped/voided meals without authorization and subsequently pocketed the cash paid by patrons, purposefully failed to account for tips paid to GM employees, and handled all of GM's payroll practices without assistance from a third-party service provider." (*Id.* at 40 ¶¶ 84-85.)

Named Plaintiffs seek summary judgment on Count Seven on several grounds, including that GM and Ray "have no evidence that Named Plaintiffs were in any way 'enriched' by the alleged improper conduct." (Doc. 75 at 15.) In their response, GM and Ray make no effort to address this argument or otherwise defend the sufficiency of Count Seven. (Doc. 80.)

Under Arizona law, an unjust enrichment claim has "five elements: (1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and impoverishment, (4) the absence of justification for the enrichment and impoverishment, and (5) the absence of a remedy provided by law." *Freeman v. Sorchych*, 245 P.3d 927, 936 (Ariz. Ct. App. 2011). Because Named Plaintiffs' motion challenged the sufficiency of GM's and Ray's evidence as to the first element (enrichment), GM and Ray were obligated under *Celotex* to come forward with evidence that each Named Plaintiff was enriched by the challenged conduct. *Devereaux*, 263 F.3d at 1076. GM and Ray failed to do so. As discussed in earlier portions of this order, the only potential evidence of tortious conduct proffered by GM and Ray relates to Alexander's alleged false claim that she had arranged for a new payroll provider to replace ADP. But GM and Ray make no effort to explain how (let alone present evidence establishing that) Alexander was personally enriched by this conduct. Accordingly, Named Plaintiffs are entitled to summary judgment on Count Seven.

…

H.    **Count Eight: Common Law/Implied Indemnity**

Count Eight is a claim against Alexander for "common law/implied indemnity." (Doc. 11 at 41-42 ¶¶ 91-101.)  It alleges that Alexander "has a common law duty to indemnify Counterplaintiffs for any and all wage claims resulting from her duties as Payroll Coordinator" because they "entrust[ed] Alexander with sole responsibility of [The Golden Margarita's] payroll practices and addressing and/or correcting issues regarding same." (*Id.*)

Named Plaintiffs argue that Alexander is entitled to summary judgment on Count Eight because "counterclaims concerning indemnity or contribution are barred when the federal law in question does not provide indemnity or contribution as a defense. . . . Because no such claim exists under the FLSA or federal common law, there is no set of facts that Defendants can prove that will allow them to prevail on this claim." (Doc. 75 at 15.)  In their response, GM and Ray make no effort to address this argument or otherwise defend the sufficiency of Count Eight.  (Doc. 80.)

Alexander is entitled to summary judgment on Count Eight.  In *Scalia v. Employer Solutions Staffing Group, LLC*, 951 F.3d 1097 (9th Cir. 2020), the Ninth Circuit "join[ed] the Second Circuit in holding that the FLSA does not imply a right to contribution or indemnification for liable employers" and also "decline[d] to make new federal common law that recognizes those rights." *Id.* at 1105.  GM and Ray make no effort to explain why those holdings do not foreclose their "common law/implied indemnity" claim against Alexander.  *See also Lyle v. Food Lion, Inc.*, 954 F.2d 984, 987 (4th Cir. 1992) ("Food Lion counterclaimed and filed a third-party complaint against Tew on the ground that he breached his contract with Food Lion and his fiduciary duty to the company as a meat market manager by himself violating and allowing Lyle, an employee under his supervision, to violate Food Lion's policy against off-the-clock work.  Both the counterclaim and the third-party complaint were dismissed by the district court.  In effect, Food Lion sought to indemnify itself against Tew for its own violation of the FLSA, which the district court found, and we agree, is something the FLSA simply will not allow.")

1        Accordingly,

2        **IT IS ORDERED** that:

3        1.        Plaintiffs' motion for partial summary judgment (Doc. 75) is **granted in part**

4   **and denied in part**.

5        2.        Moving Defendants' motion for partial summary judgment (Doc. 76) is

6   **granted in part and denied in part**.

7        Dated this 16th day of December, 2025.

8

9

10                                                          _____
                                                            Dominic W. Lanza
11                                                          United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28